[Crim. No. 25783. Second Dist., Div. Five. Jan. 19, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD GERALD RODGERS, Defendant and Appellant.

## COUNSEL

Philip A. DeMassa for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Cynthia S. Waldman and Kent M. Bridwell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—Defendant Richard G. Rodgers and his brother, Joseph, were charged with conspiracy to possess heroin for sale (count I) and with possession for sale (count II). After a court trial, defendant was convicted on count II, possession for sale, and his brother was acquitted on both counts. Defendant was placed on probation.

At defendant's preliminary hearing, certain evidence found in his house was suppressed. The magistrate, however, refused to suppress heroin found on defendant's person. In the superior court, a motion to suppress the evidence under section 1538.5 was also denied. Defendant's motions for disclosure of the identity of an informant were denied by the magistrate as well as by the superior court.

### FACTS—MOTION TO SUPPRESS[1]

In January 1973, Los Angeles Police Department Sergeant Johnson received information from an untested, unreliable, confidential informant that persons by the name of Linda and Richard were dealing in large amounts of heroin, cocaine and marijuana. The informant stated that they had lived in the West Los Angeles area on Butler, but that sometime in November 1972 they had moved to somewhere in the San Fernando Valley. The informant furnished a phone number. He said that he had "called that number, [and that] narcotics, heroin would be delivered by Linda or Richard or together. The narcotics would be delivered in a tan Mercedes 4-door and a black Volkswagen."

Sergeant Johnson then learned that the phone and utilities were listed to Linda Elaine Edgar on Killion Street in Van Nuys. Johnson drove to the location and observed a tan Mercedes in the driveway, and a black Volkswagen. The Mercedes was registered to defendant at an address in Bonita, near San Diego, and the Volkswagen was registered to Linda Elaine Edgar at the Butler Street address in West Los Angeles.

Sergeant Johnson drove to San Diego where he contacted various law enforcement agencies and learned that defendant had been arrested at the San Diego Airport by United States Customs while attempting to

---

[1]The statement of facts is based mostly on the transcript of the preliminary hearing which was admitted, by stipulation, at the 1538.5 hearing in the superior court. Additional evidence adduced at the 1538.5 hearing is either immaterial to any issues on this appeal or relates solely to the credibility of witnesses who testified at the preliminary hearing.

board an airplane to Los Angeles with a quantity of narcotics, and that the San Diego police had arrested defendant for possession of heroin.[2] When Johnson returned to Los Angeles, he showed defendant's photograph to the informant, who positively identified the person as "Richard."

In February 1973, Sergeant Johnson and other officers who had been assigned to the case were observing the Killion Street residence. They observed a 1972 Lincoln Continental parked in the driveway. That vehicle was registered to one Enriques Polanco at an Oakland address. Sergeant Johnson learned from a San Francisco Customs Bureau officer that Polanco was a known and convicted smuggler of narcotics, and that he was probably one of the largest heroin and cocaine suppliers in the nation. He was known to be a Mexican alien who had previously lived in the San Diego area. The agent also related that Polanco sometimes flew and sometimes drove to the Los Angeles area, where he would complete his smuggling operations from the Mexican border. When he drove he would be using either a tan Mercedes or a 1972 Lincoln Continental, which turned out to be the same Lincoln Continental that Johnson had observed at the Killion Street address.

That day, February 12, Johnson drove down to the San Diego area where he joined other officers who were observing a residence in Chula Vista. Defendant's Mercedes was parked at that location. At about 10 p.m., Polanco and another man left the residence in the Mercedes and drove to several used car lots. Eventually, Polanco dropped the other man off at a location in San Diego and returned to the Chula Vista residence.

Surveillance of the Chula Vista residence continued throughout the night. At about 11:30 a.m. the next day, Polanco left the house and again drove away in the Mercedes. He drove to a parking lot at a restaurant near the Mexican border, entered a phone booth and appeared to place a call. A few minutes later a Mexican woman wearing a bulky and "very heavy" long tweed coat—it was cool but not cold that day—walked up to the phone booth. Polanco left the phone booth and they both entered the Mercedes and drove around for awhile. They then headed north to San Diego and pulled into a gas station in Chula Vista. The woman went into

---

[2]Although defendant minimizes the evidentiary value of the information about other arrests, defendant did not attempt to trace the source of Sergeant Johnson's information. Rather, at the 1538.5 hearing, defendant attempted, largely without success, to trace the source of the information about one "Polanco," a suspected major narcotics dealer.

the bathroom and stayed about five minutes while Polanco made a phone call. The woman left the bathroom, Polanco the phone booth and both got back into the Mercedes. The woman reached into the center of the seat. They drove to a supermarket where Polanco left her. He drove to a house, then returned to the gas station near the market where he entered a phone booth and stayed about 20 minutes. He then drove back to the market, picked up the woman and some groceries, drove to San Diego where he picked up another man, and then drove to the Mexican border where the woman took the groceries out of the car, placed them in a shopping cart and pushed them across the border to Tijuana.

Polanco then drove to the San Diego Airport, where he picked up defendant and his brother. The "other man" was now driving a white Buick Riviera and followed the Mercedes. After driving "all over San Diego for a while" Polanco left the Mercedes and got into the Buick Riviera. The Mercedes and the Buick then left in separate directions. Johnson followed Polanco to the Chula Vista house and then to a shopping center in Bonita. Defendant and his brother were in the shopping center in the Mercedes. Polanco handed a brown paper bag through the window to defendant and then both vehicles left in separate directions.

Meantime, Sergeants Pfalzgraf and Lang, who had been left behind watching the Killion Street house, arrived in San Diego in time to observe Polanco pick up defendant and his brother at the San Diego Airport. Pfalzgraf followed the Mercedes (while Johnson was following the Buick) to the shopping center in Bonita. He observed Polanco reach his hand out of a window in the direction of the passenger in the Mercedes but could not testify to "anything more" than that. Sergeant Pfalzgraf followed defendant and his brother northbound toward Los Angeles. About 15 to 20 miles north of San Diego, defendant and his brother pulled off the freeway, ate dinner, returned to the car, drove, and pulled off the road, where defendant was observed bending over in the front seat. They got back on the freeway and Sergeant Pfalzgraf could observe a lot of movement on the part of defendant in the passenger seat; at times he would be out of view, bending down in the seat.

They drove to the Los Angeles International Airport. Defendant went to a parking area. After a short while defendant, now driving the Lincoln Continental, drove into a gas station near the airport, where his brother, driving the Mercedes, was waiting. After a joint visit to the men's room, they drove their cars to the Killion Street address, still followed by the

police. There Sergeant Pfalzgraf instructed the officers to arrest defendant and his brother. Defendant was arrested by Sergeant Lang, who conducted a cursory search for weapons, but did not then retrieve a bulge in defendant's pocket. Later, however, before defendant was placed in the police car, he was searched by Sergeant Pfalzgraf and two condoms, containing two ounces of heroin were recovered.

## FACTS—TRIAL[3]

Because of the quantity of heroin involved—1 ounce yields between 56 and 60 "dime" bags—and the fact that the 2 ounces found on defendant were not broken down into small quantities, Sergeant Pfalzgraf expressed his opinion that the purpose of defendant's possession was resale, rather than personal use. The heroin recovered from defendant had a "street value" of about $1,350. Further, heroin for use was readily available in Los Angeles and the fact that defendant had travelled to San Diego to obtain the two ounces indicated that he had not acquired it for his own consumption. It was, however, cheaper to buy heroin in bulk. Pfalzgraf did conclude from the marks on defendant's arm that he was addicted to illegal drugs.

The defense, in brief, was that defendant was an addict and had sufficient funds to support his habit with bulk purchases, which he made wherever he could obtain the best heroin most cheaply.

Additional facts will be set forth where relevant to our discussion.

## DISCUSSION

Defendant attacks the trial court's denial of his motion to suppress the heroin found on his person in a number of ways. He claims that the court either should have ordered a disclosure of the identity of the informant, or weighed the evidence relevant to the issue of probable cause to arrest him without considering the information furnished by the informant. He further argues that even with that information—and certainly without it—the evidence was insufficient to support the validity of his arrest.

We can make short shrift of defendant's arguments on the insufficiency of the evidence. ■ A perusal of the facts demonstrates that

---

[3]We summarize the facts relevant to the only defense of substance: that defendant possessed the two ounces for use, rather than for sale. Much of the pretrial testimony was also presented at the trial, to establish—or negate—intent to sell.

there was ample evidence to support a finding of probable cause, even if one disregards the information given to Sergeant Johnson by the unidentified informant. Nevertheless, the record does disclose certain evidence, which we need not detail, which affects the credibility of the prosecution's case on the issue of probable cause. If the prosecution, properly put to the choice of revealing the identity of the informant or having Sergeant Johnson's testimony on what he learned from the informant struck from the record, had elected the latter alternative, a negative finding on the issue of probable cause would have been a possibility.

■ We hold, however, that defendant did not properly compel this election.

The question is not whether the People were privileged to refuse to disclose the identity of the informant. Clearly they were. (Evid. Code, § 1041.) The issues are, rather, what "order or finding of fact adverse" to the People would have been appropriate under section 1042, subdivision (a), of the Evidence Code, and, as noted, whether defendant properly made an adequate record to compel the trial court to make that adverse order or finding.

Apart from a wholly unmeritorious argument, dealt with below, that defendant was entitled to learn the identity of the informant because he was "a material witness on the issue of guilt" (Evid. Code, § 1042, subd. (d)), defendant urged discovery of the informant's name on three theories.

Theory No. 1: The informant was unreliable and the exception to section 1042, subdivision (a), contained in section 1042, subdivision (c), is therefore inapplicable.

Theory No. 2: Defendant was entitled to disclosure to test the truthfulness of Sergeant Johnson's testimony concerning the information received from the informant. (See *Theodor* v. *Superior Court,* 8 Cal.3d 77, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234].)

Theory No. 3: Defendant was entitled to determine whether the informant talked because he, himself, had been illegally arrested. (*Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, 104-105.)

We assume for the sake of argument only that all three theories validly applied to this case.[4]

This is what happened: At the 1538.5 hearing in the superior court, after the balance of the evidence had been received, defendant's counsel moved as follows: "Your Honor, we would make a motion at this time as it relates to the 1538.5 and also the information that this informant provided should not be considered as part of the basis for probable cause to make an arrest as to the Rodgers."

Counsel's motion, as made, recognized that if the prosecution persisted in withholding the informant's name, the appropriate adverse order would have been the excision of Johnson's testimony relating to the informant. (*People* v. *Williams,* 51 Cal.2d 355, 359 [333 P.2d 19]; *Priestly* v. *Superior Court,* 50 Cal.2d 812, 819 [330 P.2d 39]. Cf. *Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, 100-101.) As matters developed, however, he failed to insist on an appropriate ruling, and, by legal implication, abandoned the point.

The motion quoted above was followed by lengthy argument. Eventually, the only ruling made by the court was: "Motion to disclose is denied." That, however, was a nonruling. The prosecution's privileged refusal to disclose the identity of the informant by exercising its privilege under section 1041 was a palpable fact. Counsel's motion had assumed that he could not force a disclosure, and could only apply for the appropriate sanction, which is what he did when he asked that the information "that this informant provided should not be considered as part of the basis for probable cause to make an arrest . . . ."[5] That application, however, was never ruled on.[6] Under these circumstances, counsel is "presumed to have waived a ruling" as if he had never asked for it. (*People* v. *Staver,* 115 Cal.App.2d 711, 724 [252 P.2d 700].)

[4]The Attorney General claims that theory No. 1 is inapplicable because the informant, although admittedly unreliable at the outset, was vindicated by what the investigation turned up.

Theory No. 2 may not apply here because it is doubtful that defendant has made the threshold showing demanded by *Theodor*. (*Ibid.,* p. 101.)

The legal validity of theory No. 3 was only raised but not decided in *Theodor*.

[5]As a matter of fact, just before making his motion, counsel expressed a desire to recall Johnson to the stand—apparently to have him claim the privilege once more. Counsel, however, immediately changed his mind, "based on the preliminary hearing transcript."

[6]We discount the possibility that counsel reasonably understood the actual ruling to be the court's way of ruling on the motion that was made. If we have ever seen a record in which defense counsel knew precisely what he was doing, this is the one.

" '[W]here the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court *actually rule.* If the point is not pressed and is forgotten, he may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place.' [Citations.]" *(People* v. *Obie,* 41 Cal.App.3d 744, 750 [116 Cal.Rptr. 283]. Italics in original.)[7]

What all this amounts to is that the point is not arguable on this appeal. The law in that respect has been settled ever since *Coy* v. *Superior Court,* 51 Cal.2d 471 [334 P.2d 569]. There the prosecution's entire case on the validity of an arrest depended on information supplied by an informant whom the arresting officer refused to identify. Nevertheless, the Supreme Court granted no relief: "In the present case no motion to strike the officer's testimony was made after the identity of the informer was refused, and neither in his objection to the introduction of the narcotics in evidence nor by argument elsewhere in the record did defendant indicate that he was relying on the refusal to identify the informer to establish the illegality of the arrest and search. The magistrate did not err in sustaining the objection to the question asking the identity of the informer, for the prosecution was entitled to elect between disclosure and having the officer's testimony struck. *It was incumbent on defendant to compel this election, however, by moving to strike or otherwise making his position clear. . . .* To hold that the magistrate or trial court must strike the evidence on its own motion when the objection to it has not been called to its attention would open the door to needless repetitions of preliminary hearings. It would also permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal and a new trial ordered. No undue burden is placed on the defendant by requiring him to make a motion to strike when the basis for excluding evidence theretofore properly admitted becomes apparent, and there is no basis for departing from the settled rule requiring such a motion [citations omitted]." (51 Cal.2d at p. 473. Italics added.)

Defendant's other contentions concerning the legality of his arrest require little discussion. First, assuming probable cause to arrest, the police were not required to obtain a warrant. *(People* v. *Superior Court (Kiefer),* 3 Cal.3d 807, 813 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d

---

[7]We can see excellent tactical reasons for counsel's reluctance to press further. Having in mind the totality of the evidence, the chances that the court would find probable cause even if it excised the information from the unidentified informant were excellent and the entire effort in forcing the prosecution to an election would have been wasted.

559].) Second, assuming, as he claims, that his arrest near his house was only a pretext to search the house, evidence seized from his house was excluded because the police did not comply with Penal Code section 844, and defendant cannot complain. Finally, whether Sergeant Lang lacked a good faith subjective belief that defendant possessed heroin is beside the point; Lang arrested defendant on Pfalzgraf's instructions.

■ The record adequately supports an inference that the officers who were conducting the investigation both in Los Angeles and San Diego kept in touch with each other, so that Sergeant Pfalzgraf's knowledge with respect to probable cause included the information gathered by the others, particularly Johnson's. This is therefore not a case of "post-arrest pooling" of information relevant to probable cause. (Cf. *People* v. *Coleman*, 258 Cal.App.2d 560, 563, fn. 2 [65 Cal.Rptr. 732]; cf. *Dyke* v. *Taylor Implement Co.*, 391 U.S. 216, 222 [20 L.Ed.2d 538, 544, 88 S.Ct. 1472].)

We can dispose of defendant's contentions concerning matters which occurred at the trial, without extended discussion.

■ Defendant's claim that he was entitled to the disclosure of the informant's identity on the issue of guilt or innocence is without merit.[8] Defendant did not show even a "reasonable possibility" that the informant could provide testimony material to some theory of defense. (E.g., *Honore* v. *Superior Court*, 70 Cal.2d 162, 168 [74 Cal.Rptr. 233, 449 P.2d 169].)

His argument was that although "the information from the informant . . . was that a Richard and Linda were selling drugs, and that the witness had never been to the residence, it is highly probable that the informant *might* testify that any contact he had made was actually with Linda alone thus tending to exonerate Richard."

This theory has nothing to do with this case. Defendant was charged with possession for sale based on his personal possession of heroin when

---

[8]Evidence Code, section 1042, subdivision (d), which applies to demands for disclosure on the issue of guilt does not distinguish between reliable and unreliable informers. Rather, when the People assert a privilege not to disclose the informant's identity (§ 1041) the issue is "whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial."

arrested; neither the informant nor Linda could have furnished relevant information.[9]

■ The contention that the evidence was insufficient to sustain a conviction of possession *for sale* is equally without merit. The trial court was not required to believe defendant's version that he, his brother, and Linda Edgar were heavy users and bought in quantity in San Francisco and San Diego, where the quality was better. Equally, the trial court was entitled to believe the officers' expert testimony that that quantity of heroin, packaged as it was, was intended for sale.

■ Finally, defendant's contention that the trial court erred in admitting the heroin into evidence, because the chain of custody had not been adequately established, is without merit. Defendant points out that in February and July of 1973, the substance containing heroin weighed 45 grams, and that in February 1974, the substance weighed about 51 grams. Moreover, the percentage of heroin was greater when the substance was analyzed in February 1974. Both chemists agreed that the difference in weight was explainable only by human error.

Any conflicts in the testimony concerning the condoms of heroin and the paper bag in which they were contained were resolved by the trial court against defendant. Moreover, defendant does not contend that the heroin taken from him had been tampered with before it reached the chemist who analyzed it in February and July of 1973. "It was the chemist's testimony that was material; it is unnecessary to produce the actual narcotic at the trial, if the character of the evidence seized is otherwise proved. [Citation.]" (*People* v. *Lamb,* 24 Cal.App.3d 378, 383 [101 Cal.Rptr. 25].)

The judgment is affirmed.

Hastings, J., concurred.

**ASHBY, J.**—I concur. Even though defendant did not properly compel the People to elect to reveal the identity of the informant or not use the

---

[9]Defendant suggests that the informant may have been one Stahl, who was his supplier rather than his customer. There was, of course, nothing to prevent defendant from calling Stahl as his own witness.

information supplied by him, the record shows that the trial court in finding probable cause based its finding on the observations of the police officers and not on the information supplied by the informant.[1]

A petition for a rehearing was denied February 5, 1976, and appellant's petition for a hearing by the Supreme Court was denied March 24, 1976.

---

[1]The following exchange between the court and Deputy District Attorney Rosen occurred prior to the court's ruling on defendant's motion to suppress:

"THE COURT: When the defendants were eventually stopped and arrested why were they stopped?

". . . . . . . . . . . . . . . . . . . . .

"MR. ROSEN: They were stopped . . . at that particular point in time by the officers for the activity which was observed for the entire day and the information they had about these individuals.

". . . . . . . . . . . . . . . . . . . . .

"THE COURT: I think there is enough activity here to support probable cause. Motion denied."