[Crim. No. 9046. Third Dist. June 21, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
ELEAZAR BARAJAS, Defendant and Appellant.

COUNSEL

Kevin P. Regan, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Marjorie Winston Parker and Paul H. Dobson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PARAS, Acting P. J.**—Defendant appeals from the judgment following conviction by a jury of possession of heroin for sale in violation of Health and Safety Code section 11351.

On April 28, 1976, Tony Zuniga, an auxiliary police officer with the Lodi Police Department, assisted another officer in arresting defendant for a traffic violation and for possession of a knife. After being advised of his *Miranda* rights defendant falsely identified himself as Francisco

Rubio Perra (he was known to Zuniga by the name of Eleazar). When questioned as to his residence status, he said that he had a "green card" but that it was at home; he did not, however, know the location of his home. He was given a misdemeanor citation and released.

The next day Zuniga informed a fellow officer, Detective John Martin, of what had transpired. Suspecting that defendant was an illegal alien, Martin made a telephone inquiry of United States Immigration and Naturalization Service Agent James Kerr in Stockton. Kerr ran a record check by giving defendant's vital statistics to his main office in Livermore and receiving word in return that defendant had been apprehended on two prior occasions, one of them on September 25, 1975. He also was informed that defendant had been "formally deported" at that time. Such information was taken from an "apprehension report" which was introduced into evidence as People's exhibit No. 1.

Kerr telephoned Martin with this information; he said he could not then leave his office and asked that Martin (or any other Lodi police officer) arrest defendant, telling Martin that it was a felony to reenter the United States after deportation. Kerr knew that even though a person was deported, he could nonetheless reenter the country legally by obtaining special permission from the Attorney General, something rarely given; where such permission was obtained, sector offices such as that in which Kerr worked were not notified.

After Martin received this information, he and Zuniga drove separate vehicles to the 100 block of North Sacramento Street in Lodi in order to arrest defendant. As Zuniga parked his vehicle, he noticed defendant standing outside the Royal Cafe. When defendant saw Zuniga, he entered the cafe. Zuniga radioed Martin, then himself entered the cafe where he saw defendant by the bar and arrested him. Martin then took defendant a short distance down the street to a hotel in which defendant indicated that he had a room. However, once inside, defendant denied having a room there. While Zuniga further investigated the asserted residence at the hotel, Martin searched defendant for weapons and contraband before transportation. While patting down defendant, he felt something in the left front pocket. A search of the pocket revealed 5.5 grams of 34 percent pure heroin in a wax paper wrapping.

Martin, through Zuniga (who spoke Spanish) advised defendant of his *Miranda* rights. Defendant then asserted that he had found the heroin on the street, and not knowing what it was, put it into his pocket.

Later, after being booked into jail, defendant was visited by Mary Silva. Their conversation, which was entirely in Spanish, was monitored and tape-recorded by Martin and Zuniga. On the tape, which was translated, transcribed and played to the jury, defendant stated that he had been caught with "Chiva" and that he had passed two grams to a person named "Chivo" because "he was going to be holding. . . ." He indicated that he could not "throw it away" when he was sitting at the bar and that they found it in his pocket. He claimed it was about one gram. The translator of the tape testified that the term "Chiva" in the context of the conversation was street language for heroin.

There was expert testimony that the normal dosage for a user of heroin was one-half to three-quarters of a gram of 3 percent to 4 percent pure heroin. The 5.5 grams of 34 percent pure heroin in defendant's pocket was of high quality and, if broken into street dosages, would be worth about $2,750. The expert testified that the amount of heroin was more than a street dosage and of sufficient quantity to be possessed for sale.

Defendant makes the following contentions on appeal:

1. Local police cannot make arrests for violations of 8 United States Code sections 1325 or 1326.

2. His arrest was unlawful under the provisions of the federal Immigration and Nationality Act.

3. There was no probable cause to believe he had committed a felony.

4. There was no misdemeanor being committed in the arresting officer's presence.

5. The fruits of the unlawful arrest should have been suppressed.

6. The search of his person incident to the arrest was excessive in scope and therefore unlawful.

7. The tape recording of his conversation while in custody was erroneously admitted into evidence.

8. His right to represent himself was improperly denied.

I

■ Defendant claims that local police cannot make arrests for violations of 8 United States Code sections 1325 or 1326. Section 1325

makes it a misdemeanor for an alien to enter the country illegally (a "subsequent commission" is a felony), and section 1326 makes it a felony for an alien to reenter the country after deportation without permission from the Attorney General. The argument is based upon a conclusion reached in a recent article, *Illegal Aliens and Enforcement: Present Practices and Proposed Legislation* (1975) 8 U.C. Davis L.Rev. 127, 145-146.

That article points out that in 8 United States Code section 1324 Congress specifically included local law enforcement officials among those who could arrest for violation of that section. It reads: "No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, *and all other officers whose duty it is to enforce criminal laws.*" (Italics added; 8 U.S.C. § 1324 (b).) The article then notes that section 1325, unlike section 1324, does not say anything about local enforcement; the article concludes: "Since both of these sections deal with illegal entry into the United States and since both were considered by the same Congress, the legislators apparently intended one to be enforced by all enforcement officials and one to be enforced only by the INS." (8 U.C. Davis L.Rev., *supra,* at p. 146.) The argument is fallacious. Sections 1324, 1325 and 1326 were all three enacted on June 27, 1952, and were before the Congress as sections 274, 275 and 276 respectively of H.R. No. 5678 (82d Cong., 2d Sess.), the Immigration and Nationality Act of 1952. As originally drafted, none of the three contained any language of limitation or exclusion regarding the power of arrest (see H.R. No. 5678, Oct. 9, 1951, pp. 89-90). Then section 1324 was amended (see H.R. No. 5678, Rep. No. 1365, Feb. 14, 1952, p. 92) to add "No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the Service . . . and all other officers *of the United States* whose duty it is to enforce criminal laws." (Italics added.) At that point the intention cannot be misunderstood; arrests for violation of section 1324 were to be made only by federal personnel, while by clear implication section 1325 and 1326 arrests were to be made by state and local officers as well. Further in the legislative process, however, as the law review article itself notes (8 U.C. Davis L.Rev., *supra,* at p. 145), the words "of the United States" were stricken by further amendment from section 1324 (see H.R. No. 5678, Apr. 28, 1952, p. 89). That can only mean that the scope of the arrest power under section 1324 was enlarged; in no way can it mean that the scope of arrest under the other two sections was restricted. Such an acute nonsequitur

would attribute to the Congress both serious inconsistency and profound lack of logic.

Defendant's reliance upon the supremacy clause of the federal Constitution is misplaced. It is true that under the supremacy clause, Congress has preempted the field of immigration. (See *De Canas* v. *Bica* (1976) 424 U.S. 351 [47 L.Ed.2d 43, 96 S.Ct. 933]; *Hines* v. *Davidowitz* (1941) 312 U.S. 52 [85 L.Ed. 581, 61 S.Ct. 399].) And as the law review article points out, there are reasons why Congress might choose to limit local enforcement (e.g., enforcement of immigration laws sometimes has international overtones). But Congress has not done so. The supremacy clause is a two-edged sword, and in the absence of a limitation, the states are *bound* by it to enforce violations of the federal immigration laws. The statutory law of the United States is part of the law of each state just as if it were written into state statutory law. (*Hauenstein* v. *Lynham* (1880) 100 U.S. 483, 490 [25 L.Ed. 628, 630-631]; *People* ex rel. *Happell* v. *Sischo* (1943) 23 Cal.2d 478, 491 [144 P.2d 785, 150 A.L.R. 1431].) Since there is no limitation relative to sections 1325 and 1326, the Lodi police officers had the power to arrest for their violations.

II

■ Defendant's second contention is that his arrest was unlawful because the police officers did not comply with the warrant requirements of 8 United States Code section 1357. But that section defines the powers of officers or employees of the immigration service, and by its express terms applies only to them. It does not govern arrests by other law enforcement officials. In the absence of a specific law regulating the mode of such an arrest, the legality of an arrest by local officers is determined by the law of arrest of the state in which it occurs, unless such law conflicts with the federal Constitution. (*Ker* v. *California* (1963) 374 U.S. 23, 37 [10 L.Ed.2d 726, 740, 83 S.Ct. 1623].)

. . .

Defendant argues that permitting local police officers to make warrantless arrests (under Pen. Code, § 836) for immigration violations undermines the congressional warrant policy expressed in section 1357 and will permit federal officials to avoid the warrant requirement whenever they choose by simply asking a local police officer to make the arrest. The short answer is that Congress has the power to make the warrant requirement applicable to all arrests but has not done so. We are certainly

in no better position than Congress to decide whether its policies are or are not undermined by existing law.

## III

Defendant argues that there was no "reasonable cause" (as required by Pen. Code, § 836) for the officers to believe that a felony had been committed. He admits that such "reasonable cause" may be supplied by hearsay information received by the arresting officers through "official channels." (*People* v. *Lara* (1967) 67 Cal.2d 365, 371 [62 Cal.Rptr. 586, 432 P.2d 202].) But he points out that in such a case not only the arresting officer, but also the officer who initiates the arrest (in this case Kerr), must have probable cause to believe a felony has been committed. (*Id.,* at p. 374; *Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11]; *People* v. *Rodgers* (1976) 54 Cal.App.3d 508 [126 Cal.Rptr. 719].)

In support of his argument that Kerr did not have reasonable cause, defendant cites the testimony of Glen Smith, the border patrol agent in charge of the Stockton office. Smith stated that defendant's immigration file, upon which Kerr based his information, revealed that defendant had received a deportation hearing and was required to leave the United States on September 27, 1975. However, he was not deported, but left as a result of an order requiring him to leave in lieu of deportation. Also in the file was a warrant for defendant's arrest and an order for another hearing set for October 2, 1975. However, Smith could not tell whether that hearing was held or whether defendant was deported because of it. Smith stated that the documents (labeled as People's exh. No. 1) indicated "*very possibly* the man was previously deported back in August of 1968, at which time he had been charged with a felony and at that time prosecution was declined. But no doubt deportation was set up." (Italics added.) Smith admitted, however, that the records were not conclusive.

Based upon such testimony, defendant asserts that the records were insufficient for Kerr to reasonably conclude that he had been deported or was in the country illegally. ■ We disagree. The reasonableness of inferences to be drawn from these records was a question of fact, and we will not disturb the trial court's implied finding, on disputed evidence, that Kerr's interpretation was reasonable.

Moreover, the arresting officers had information in addition to that supplied by Kerr. Their knowledge of defendant's evasive conduct (use of

a false name, claim to possession of a "green card" not on hand but at home, and lack of knowledge as to location of home so as to allow production of the card) during the April 28 incident, coupled with Kerr's information, gave them ample probable cause to arrest for violation of 8 United States Code section 1325 or 1326.

## IV and V

Our above conclusion makes it unnecessary to consider defendant's argument that there was no misdemeanor being committed in the officer's presence and that the fruits of the arrest should have been suppressed.

## VI

Defendant argues that the search incident to the arrest was excessive in scope. Relying upon *People v. Brisendine* (1975) 13 Cal.3d 528, 539 [119 Cal.Rptr. 315, 531 P.2d 1099], *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 201-202 [101 Cal.Rptr. 837, 496 P.2d 1205], and *People v. Millard* (1971) 15 Cal.App.3d 759, 762 [93 Cal.Rptr. 402], he argues that since the immigration crime for which he was arrested did not involve contraband and there were no fruits or instrumentalities of the crime, the officers were only entitled to search for weapons; yet Martin testified that the heroin did not feel like a weapon.

Of course, as part of being booked into jail (which later took place), defendant was subject to a full body search in order to "provide for the safety of police personnel and other prisoners, to prevent the introduction of weapons and contraband into the jail, and to inventory the entering prisoner's property." (*People v. Maher* (1976) 17 Cal.3d 196, 201 [130 Cal.Rptr. 508, 550 P.2d 1044].) Therefore the heroin would have been discovered later, unless somehow disposed of by defendant en route to the jail. ■ Can the search therefore be justified as an "accelerated" booking search? We so hold.

*Brisendine, supra,* 13 Cal.3d at page 536, notes that *People v. Superior Court (Simon), supra,* 7 Cal.3d at pages 199-201 (which invalidated a contraband search incident to a traffic violation detention), divided traffic offenders into three discernible groups for purposes of searches incident to arrest: "(1) those who are merely cited and immediately released (Veh. Code, §§ 40500, 40504), (2) those who may or must be taken before a magistrate and given the option to post bond (Veh. Code, §§ 40302, 40303), and (3) those who are arrested for felonies and booked according

to the general Penal Code provisions on felony arrests (Veh. Code, § 40301; Pen. Code, § 7, subd. 21)." (See also *People* v. *Maher, supra,* 17 Cal.3d at p. 199.)

In a subsequent series of cases involving misdemeanor offenses similar to the first category identified in *Simon* but subject to the citation procedures of Penal Code section 853.6, our Supreme Court struck down "accelerated booking searches" on the ground that "a full booking search is 'inappropriate in the context of an arrestee who will never be subjected to that process.' " (*People* v. *Longwill* (1975) 14 Cal.3d 943, 950 [123 Cal.Rptr. 297, 538 P.2d 753] (public drunkenness); see *People* v. *Norman* (1975) 14 Cal.3d 929, 934 [123 Cal.Rptr. 109, 538 P.2d 237] (evading arrest for a traffic infraction); *People* v. *Maher, supra,* 17 Cal.3d 196 (public drunkenness); *People* v. *Brisendine, supra,* 13 Cal.3d 528, (illegal open campfire).) In that regard, noting that the People have the burden of demonstrating that the police intended to take the defendant to jail for booking (*People* v. *Longwill, supra,* 14 Cal.3d at pp. 949-950), the Supreme Court expressed itself as follows: "The People, however, seek to justify the instant search as a form of 'accelerated booking search.' The reasoning proceeds from the premise that a full custody search is permissible at the stationhouse prior to booking, and therefore it is not a significantly greater intrusion into the sanctity of the person of the arrestee if the search is conducted in the field. *We have no quarrel with this rationale if in fact the individual is to be subjected to the booking process.*" (Italics added; *People* v. *Longwill, supra,* 14 Cal.3d at p. 948.)

Indeed, where booking is anticipated as is generally the case in felony arrests (see Witkin, Cal. Criminal Procedure (1963) Proceedings Before Trial, §§ 113, 114, pp. 110-113), it takes place at the jail facility (cf. *People* v. *Maher, supra,* 17 Cal.3d at pp. 199-201), with the attendant possibility that an unsearched arrestee may, before or during the booking process, pass contraband to others or secrete it for later retrieval. Under such circumstances, it is permissible for the officers to conduct a contraband search prior to arrival at the jail facility.

A collective reading of Penal Code sections 849, 851.5 and 11112, along with section 7, subdivision 21, leads to the conclusions on the facts of this case that (1) in felony arrests, booking is the normal and standard procedure, (2) would have taken place here in the absence of the heroin, and (3) would have uncovered the heroin had there been no field search. Under the circumstances, the search was lawful and not of the type

condemned by *People* v. *Superior Court (Simon)*, *supra*, 7 Cal.3d 186, and its progeny.

Defendant argues that an early search cannot be justified because "There always exists the possibility that between arrest and booking, facts will become known which will cause the arresting officers to release an accused from custody." This contention is too speculative for serious consideration.

## VII

Defendant contends on three separate grounds that the tape recording of his conversation with Mary Silva was erroneously admitted. First, he argues that the tape was not properly authenticated as required by Evidence Code sections 1400, 1401, because the "chain of custody" was not shown.

The conversation was monitored by Martin and Zuniga. Martin recorded while Zuniga contemporaneously translated for Martin's benefit. Martin testified that he then marked the cassette tape and placed it in the evidence locker "until the next day in which it was translated by Officer Zuniga to a stenographer and then typed in English." At trial, Martin identified the cassette as the one he took of the conversation. Over defendant's objection on "chain of custody" grounds, the tape was admitted into evidence.

One day after the tape was admitted into evidence, it was played for the jury, following which an investigator for the district attorney's office, Tony Martinez, testified that he had translated it into English. His translation was then also introduced into evidence and read to the jury. Prior to the playing of the tape, defendant's counsel made objections based upon the "best evidence" rule and upon the ground that parts of the tape were unintelligible. He did not however at that time object on the ground that no chain of custody was shown before the tape came into Martinez' hands.

On appeal, defendant now for the first time argues that in the absence of such a showing "there is no way of ascertaining whether the recording Mr. Martinez translated was in fact the one made by Martin at the Lodi Police Station, or, even assuming it was the same one, whether any changes in the contents of the tape took place in the interim."

■ By failing to object in the trial court, defendant has waived this objection and may not raise it on appeal. (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 472 [117 Cal.Rptr. 757].) In any event, the contention lacks merit. Martin's identification of the tape cassette as the one he had used and Martinez' identification of the same cassette as the one from which he had prepared his transcript provided sufficient authentication. Any significant alteration of the tape could have been discovered by comparison of the Zuniga and Martinez translations, both of which were available to defendant. No claim of alteration was made until the appeal, making it mere speculation.

■ Second, defendant argues that the "best evidence rule" (Evid. Code, § 1500) prevented use of a written transcript of the tape, and that under Evidence Code section 753, subdivision (a), which permits translations, Martinez should have been forced to make a contemporaneous oral translation without using the written transcript. Such an argument prefers formalism over accuracy. The transcript was admissible and did not violate the best evidence rule. (*People* v. *Fujita, supra*; *People* v. *Finch* (1963) 216 Cal.App.2d 444, 454 [30 Cal.Rptr. 901].)

■ Third, defendant argues that the tape recording was required to be fully audible and intelligible before any of it could be admitted, relying upon *People* v. *Stephens* (1953) 117 Cal.App.2d 653 [256 P.2d 1033]. In *Stephens,* several tapes, portions of which were inaudible or unintelligible, were played for the jurors with obvious confusion on their part as to what was actually said. The district attorney had made a transcript after ". . . hours and hours of checking and very careful electronic work . . ." (117 Cal.App.2d at p. 662), but refused to show it to defense counsel and did not offer it in evidence. The appellate court stated "how many different and varied interpretations were placed upon what the recordings conveyed by the various jurors is a matter of pure conjecture." (At p. 662.) Moreover, the witnesses who participated in the taped conversations were available to testify. (At p. 662.) On such facts, the court reversed the judgment, stating that the usual justification for admitting recordings—that they are more reliable and satisfactory evidence than testimony of conversations given from memory by those who overheard them—was inapplicable. (At p. 660.)

*Stephens* is thus highly distinguishable. The unintelligible or inaudible portions of the tape in the present case were clearly so (even for those jurors who may have understood Spanish), and the carefully prepared translation left no doubt as to the evidence in the record. There was no

occasion for confusion of the sort involved in *Stephens.* In *People* v. *Finch, supra,* 216 Cal.App.2d at pages 452-453, certain passages of the recordings admitted into evidence were apparently unintelligible and defendant had objected on the ground that the records were incomplete. The court held that in the absence of a showing that any statement heard in the playing of the recording was a misstatement or that material statements were missing from the conversation, the recordings were admissible.

We hold that the tape recording and the transcript were properly admitted into evidence.

## VIII

Finally, defendant argues that his right to represent himself was improperly denied.

On November 15, 1976, the day before trial, his attorney informed the court that defendant had written a letter to Judge Woodward indicating that he wanted new counsel who could speak Spanish; he also wanted a 60-day continuance because he was not ready for trial. Defendant himself then told the court that he wanted to be rid of his attorney because there was no evidence to justify his arrest. The court inquired as to whether motions pursuant to Penal Code sections 1538.5 and 995 were made and was informed that they had been. Defendant then stated that he wanted another attorney because his present one had done nothing for him; the reason for doing nothing was that defendant should not have been arrested for something he did not possess. He repeated again that he wanted another attorney.

█ On November 16, the day of trial, defendant made another request, this time to represent himself. When the court asked him whether he understood the charge against him, he said, "I don't understand, but I don't want the attorney." The court then asked whether he understood the nature and the elements of the offense and was aware of the penalties. Defendant did not answer these questions; instead he asserted that his attorney had helped him with nothing and was not needed. Defendant then asked the court, "What right do you have to take me to a jury trial when you don't have the —." At this point, the court interrupted and found that defendant was not competent to represent himself.

Later in the day, just prior to commencement of trial, defendant renewed his motion to relieve counsel or in the alternative to represent himself. He also indicated that he wanted a 60-day continuance to get another attorney and that he had explained to Judge Woodward why he wanted another attorney.

On such record, the trial court properly found that defendant could not intelligently waive his right to counsel and invoke his right to self-representation. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) Defendant's only defense was a technical one involving the search and the admissibility of the tape recording. He was clearly incapable of adequately representing himself. His request was obviously nothing more than an attempt to delay the proceedings.

The judgment is affirmed.

Evans, J., concurred.

**REYNOSO, J.**—I dissent. The majority faces, and incorrectly decides, the issue of local police authority to arrest an alien for violation of the immigration statutes of 8 United States Code section 1325[1] (misdemeanor for an alien to enter the country illegally) and section 1326[2] (felony for an alien to reenter the country, without permission from the United States Attorney General, after a formal deportation).

---

[1]Unless otherwise noted all references are to 8 United States Code. Section 1325 reads as follows: "Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than two years, or by a fine of not more than $1,000, or both."

[2]Section 1326 reads as follows: "Any alien who—

"(1) has been arrested and deported or excluded and deported, and thereafter

"(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act, shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both."

The basis of my dissent is two-fold: First, we deal with a manifestly important policy as it affects the relation of our country to foreign nations, particularly those countries at our borders. In turn, the policy affects the relation of local police to resident citizens and aliens. The majority's holding that local officers can arrest on the basis of alienage misinterprets the national legislative scheme. Second, I dissent on the peculiar facts of this case. I conclude that the local police officer had no probable cause to arrest defendant. On this record, as a matter of law, the Immigration and Naturalization Service agent acted unreasonably in advising the arresting local police officer that defendant had committed a felony (reentry after deportation) and was subject to arrest. Thus, the arrest was unreasonable and the evidence should have been suppressed.

I

Local police officers do not have the authority to arrest individuals suspected of being aliens present in the United States without permission from the United States Government, that is, aliens who are in violation of sections 1325 and 1326. I cite two separate but dependent reasons. First, in dealing with a delicate issue of foreign affairs the supremacy clause dictates that federal power be left "entirely free from local interference." (*Hines* v. *Davidowitz* (1941) 312 U.S. 52 [85 L.Ed. 581, 61 S.Ct. 399].) In implementing immigration and naturalization laws, which affect foreign nations, national uniformity is required. The Constitution mandates that Congress, not the states, shall have authority. (U.S. Const., art. I, § 8, cl. 3.) Second, attempts by local police officers to enforce immigration laws pose an inherent danger to United States citizens and resident aliens mistaken for illegal entrants.

*1. Need for Uniformity in Dealing With Immigration and Naturalization*

Because of the necessity of uniformity in the area of international relations, Congress had been granted exclusive authority to regulate and establish a uniform policy of immigration and naturalization. (U.S. Const., art. I, § 8, cls. 3-4; *Fong Yue Ting* v. *United States* (1893) 149 U.S. 698 [37 L.Ed. 905, 13 S.Ct. 1016]; *Hines* v. *Davidowitz, supra,* 312 U.S. at p. 62 [85 L.Ed. at p. 584].) The exclusivity of this federal power has been recently affirmed by the United States Supreme Court: "Control over immigration . . . is entrusted exclusively to the federal government. . . ." (*Nyquist* v. *Mauclet* (1977) 432 U.S. 1, 10 [53 L.Ed. 63, 71, 97 S.Ct. 2120].) Such exclusive authority includes the power to regulate immigration. (*De Canas* v. *Bicas* (1976) 424 U.S. 351, 354 [47 L.Ed.2d 43, 48, 96 S.Ct. 933].)

Since the power is exclusively with the federal government, no such power lies with the states. (*Takahashi* v. *Fish Comm'n* (1948) 334 U.S. 410, 419 [92 L.Ed. 1478, 1487, 68 S.Ct. 1138].)

Unlike the majority, I conclude that the arrest and detention of aliens for violation of federal law is so clearly a matter of international relations and exclusive federal governmental activity as to effectively preclude the states from acting. "[T]he constitutional separation of the federal and state powers makes it essential that no state be permitted to exercise, without authority from Congress, those functions which it has delegated exclusively to Congress." (*Hines* v. *Davidowitz, supra,* 312 U.S. 52, quoting from *Spector Motor Service* v. *O'Connor* (1951) 340 U.S. 602, 608 [95 L.Ed. 573, 578, 71 S.Ct. 508].) In fact, Congress has exercised its authority by enacting the Immigration and Nationality Act of 1952. In turn, the act created the Immigration and Naturalization Service (INS) and entrusted to it and its agents the sole authority of enforcing the Immigration and Nationality Act.

INS regulations and internal procedure spell out the function and duty of its agents. Such agents receive intensive instruction in immigration and naturalization law; are trained in the service's operational tactics, and receive extensive field training. Those agents who will be operating near the United States-Mexican border are required to be fluent in Spanish and are trained to be sensitive to the Mexican culture. (See, statement of Leonard F. Chapman, Jr., commissioner, Immigration and Naturalization Service in Hearings on Law Enforcement on the Southwest Border, before the Subcom. on Legislation and Military Operations of the House Com. on Gov. Operations, 93d Cong., 2d Sess. (July 10, 11, 16; Aug. 14, 1974.) p. 39.) In my view, Congress has enacted such a comprehensive scheme that states may neither contradict nor complement without specific congressional mandate.

Independent local enforcement of federal immigration and naturalization laws, outside the control of the Immigration and Naturalization Service, undermines the concept of a comprehensive and uniform enforcement scheme. Local police officers have no training or expertise in immigration and naturalization laws and regulations. These statutes and regulations are as ever changing as are those of the Department of Internal Revenue. Much of the enforcement is done by internal operating procedures. Delicate legal and factual determinations must be made distinguishing between "legal" and "illegal aliens;" among those who are "illegal" there are categories of persons who are nondeportable and

others who are deportable. Difficult issues of alienage appear. If a person is a citizen, he may not be deported; if he is not a citizen, he may be deported. Citizenship, in turn, often depends on the citizenship of the parents, place of birth, registry or nonregistry of the individual's birth. Suffice it to say the complexities are not those within the competence of local enforcement officers. Attempted enforcement, by such inexpert police personnel, conflicts necessarily with the Congressional purpose and objective of uniformity. (Cf. *Hines* v. *Davidowitz, supra,* 312 U.S. 52; *Ray* v. *Atlantic Richfield Co.* (1978) 435 U.S. 151, 154 [55 L.Ed.2d 179, 186, 98 S.Ct. 998].)

Effectuation of federal immigration policy is not a matter that can be left to the vagaries of state arrest and detention law nor to the discretion of the local police officer. Even within a state, local police departments may and do operate under separate and distinct standards for arrest and detention. Thus, the San Diego County Sheriff's Department has policies respecting aliens which differ from those of the San Diego City Police Department. (See, *Illegal Aliens and Enforcement: Present Practices and Proposed Legislation* (1975) 8 U.C. Davis L.Rev. 127, 128.) Such erratic enforcement policies, when dealing with a federal matter, cannot be.

The relation of the power to arrest on the part of local officials to foreign affairs is underscored when heads of foreign states lodge official protests with the United States government regarding the treatment of their nationals. Such protests have been filed from time to time by the Mexican government. Local law enforcement can but exacerbate that situation. (See 8 U.C. Davis L.Rev., *supra,* at p. 148.)

I turn to the one statute which forms the basis for the majority's analysis. Section 1324, subdivision (b), provides that: "all other officers" in addition to officer-employees of the Immigration and Naturalization Service, whose duty it is to "enforce criminal laws" may arrest "any persons, including the owner, operator, pilot, master, commanding officer, agent or consignee of any means of transportation who" bring aliens into this country illegally or illegally harbors them. INS and other officers are given the power to arrest the perpetrators of the crime. That is, the "other officers whose duty it is to enforce criminal laws" are empowered to arrest a person who has committed a crime (illegally bringing in and harboring certain aliens) on the basis that that person has violated the law. Note that the basis for the arrest is *not* that the person

being arrested is an alien. If an alien is being smuggled into this country on a ship or is being assisted in wading across a river, it is quite natural that Congress would give the port authorities or other officers likely to personally observe such activities the power to act under those narrowly prescribed exigent circumstances.

It is on this very narrow ground that Congress has authorized agents, other than INS, to arrest. In fact, the statute merely authorizes those officers to act respecting a criminal act as they would act respecting any other criminal act. I again note that the arrest is not on the basis of alienage. Such arrests can affect the relationship of this country to others and it is found within the immigration and naturalization statutory scheme. Accordingly, it is an "exception" wherein Congress has specifically and expressly authorized the non-INS officers to act.

The Immigration and Nationality Act nowhere authorizes arrest by local police on the basis of alienage. The majority would have us believe that this overwhelming silence in the entire act is corrected by section 1324 and that we must infer that Congress intended local officers to be able to enforce all federal immigration violations. In view of the supremacy argument and the need for uniformity, the majority's conclusion is untenable. Rules of statutory construction dictate a result exactly opposite that reached by the majority. Where in one part of the statute Congress specifies an exception to a general rule and in another omits such express provision, it means to exclude the exception. (See *Passenger Corp.* v. *Passengers Assn.* (1974) 414 U.S. 453, 458 [38 L.Ed.2d 646, 652, 94 S.Ct. 690].) Further, "[t]here is no reason . . . to assume that Congress intended to invoke by omission in [one section] the same [power] which it explicitly provided by inclusion in [another]; the reasonable inference is quite the contrary." (*Federal Trade Comm'n* v. *Sun Oil Co.* (1963) 371 U.S. 505, 515 [9 L.Ed.2d 466, 476, 83 S.Ct. 358]; Accord, *United States* v. *Culbert* (1978) 435 U.S. 371, 378-379, fn. 9 [55 L.Ed.2d 349, 355, 98 S.Ct. 1112].)

For the above reasons the conclusion is compelled that the federal government has exclusive control over the question of when and who can arrest aliens on the basis of their alienage and that it has chosen to exclude local officers.

## 2. *Danger to the United States Citizens and Resident Aliens*

As has been discussed, local police officers have no training or expertise in the complexities in enforcing immigration and naturalization laws. Their awkward attempts to enforce such laws has resulted in numerous complaints of harassment from citizens and resident aliens mistaken for illegal entrants. (See, *Illegal Aliens and Enforcement: Present Practices and Proposed Legislation, supra,* 8 U.C. Davis L.Rev. 127, 144.) Such incidents, oftimes outrageous in character, are reported by the media with unfortunate regularity. One such practice came to the attention of the federal courts in *United States* v. *Mallides* (9th Cir. 1973) 473 F.2d 859, 860. There the local police apparently made it a practice to "stop 'all cars with Mexicans in them that appear to be sitting [erect] and packed in [three in the front and three in the back]. . . .' " (*Id.,* at p. 860.) The Ninth Circuit Court was not amused. INS agents, themselves far more expert, have recognized the difficulty of distinguishing among citizens, resident aliens and illegal entrants. (See testimony of Raymond Farrell, commissioner, Immigration and Naturalization Service, in Hearings on Illegal Aliens before Subcom. No. 1 of the House Com. on the Judiciary, 92d Cong., 2d Sess., ser. 13, pt. 5 at p. 1308 (1972).)

The concern is, of course, that once we establish the rule for detention and arrest, the affected individuals will include many citizens and resident aliens who will be subjected to the same investigative procedures for identification purposes. California has millions of citizens of Mexican descent. Some are descendants of early day Californios who preceded the United States conquests. Others are descendants of 19th and 20th century immigrants. Yet others are recent arrivals. In a state like California, therefore, the authority to arrest in the hands of the unskilled is a danger. Even the tactics of the skilled, the INS agents, have captured the unflattering attention of Congress. One congressman reported that "I not only received written complaints but I went down into the area [where INS searches had occurred] and I tell you, there is no greater bone of contention in Los Angeles and in San Ysidro and in National City and in Chula Vista among Americans who are of Mexican descent . . . they are being stopped all the time." (8 U.C.Davis L.Rev., *supra,* 135, fn. 61; Hearing before the Subcom. on Immigration, Citizenship and International Law of the House Com. on the Judiciary, 93d Cong., 1st Sess., ser. 22, at p. 45 (1973).) Illegal entrants, naturally, normally live and work in areas populated by people of similar characteristics. The need for care and caution in setting down the proper rules for detention and arrest bear close scrutiny. Congress, after such scrutiny, has decided not to give such power to local officers.

## II

The majority holds that the police officer had probable cause to believe that defendant had committed a felony. The record, in my view, does not support that conclusion. Absent such probable cause, the arrest was unreasonable.

The issue of whether there was probable cause for the arrest was submitted to the superior court (pursuant to a Pen. Code, § 1538.5 hearing), on the preliminary hearing transcript, on the testimony of Border Patrol Officer Glen Smith and on one exhibit.

The majority holds that probable cause existed on the basis that the agent who initiated the arrest, INS Agent Kerr, had probable cause to believe that a felony had been committed. Further, the arresting officer had independent information, which coupled with that given by INS Agent Kerr, provided ample probable cause for the arrest. Such independent information was defendant's evasive conduct during the April 28 incident.

My analysis begins with Penal Code section 836, subdivision 3. That section requires the officer to have "reasonable cause to believe that the person to be arrested has committed a felony," whether or not a felony has in fact been committed. The record is clear that, in fact, no felony was shown. That is, the record contains no evidence that defendant had been deported prior to his reentry. Accordingly, his reentry could not be a felony.

We appear to be agreed that the officer who initiates the arrest must have probable cause to believe that a felony had been committed. I accept the majority's premise that the initiating officer was INS Agent Kerr. I conclude that Kerr did not have probable cause to believe that a felony had been committed.

At the preliminary hearing, Agent Kerr testified that he had a file (marked People's exh. No. 1) which he identified as "our apprehensions report." The exhibit is not part of the record on appeal. That report, he indicated, showed that defendant had been apprehended by "us" (presumably the Immigration and Naturalization Service) on two occasions and that on the second occasion, which was on September 25, 1975, "we formally deported him to El Centro." Accordingly, Agent Kerr testified that he told Officer Martin (the arresting officer) that "we had

formally deported" Barajas. On cross-examination, Agent Kerr referred to a portion of the report which mentioned a "hearing in El Centro" on October 2, 1975. I find the testimony confusing. We will agree there can be no deportation to El Centro, California. Apparently, the officer was testifying that the defendant was sent to El Centro for a deportation hearing.

The events in El Centro are picked up by the testimony of INS Agent Glen Smith at the Penal Code section 1538.5 hearing. While the deportation hearing to be held in El Centro had been set for early October, in fact defendant was given the opportunity of "voluntary departure" and on that basis left the country before the scheduled hearing date on his own, paying his own way. That is, he was never deported. Smith testified that aliens "sometimes in lieu of order of deportation . . . are granted voluntary departures." The notation in the file that defendant had departed voluntarily and had not been deported appeared in People's exhibit No. 1 at the time Agent Kerr had the file. On the basis of this record, I conclude, as a matter of law, that there was no reasonable cause to believe that defendant had committed a felony. No reasonable officer could have so concluded. The testimony of Agent Kerr is puzzling but the facts are clear.[3]

Finally, the allegedly buttressing information was gathered during an incident (defendant was given a citation) which took place prior to the arrest which is the subject of this appeal. That "information" is the evasive response of defendant to questions pertaining to his name and residence. The information, the majority holds, provided probable cause to arrest defendant. However, this reasoning is premised on the propriety of the arrest based on defendant's alienage. Since, in my view, no such power lies, I cannot agree that "evasive conduct" can provide reasonable cause.

Defendant's motion to suppress evidence should have been granted. First, the local arresting officer had no authority to arrest on the basis of

---

[3]A warrantless arrest could have been made by Agent Kerr (or an officer on his behalf) if there was reasonable cause to believe that defendant was likely to flee jurisdiction. (§ 1357.) However, Agent Kerr testified that he had no knowledge that defendant was likely to flee. Thus, there appears to be no basis for the arrest.

The mere assumption that an illegal entry has taken place is not sufficient grounds for arrest. (See *United States* v. *Doyle* (2d Cir. 1950) 181 F.2d 479, 480.) It is a rare case, not including this case, where a police officer will have probable cause to arrest for violation of section 1326. Such probable cause requires knowledge that a prior deportation has occurred.

defendant's alienage. Second, there was no reasonable cause for defendant's arrest. Accordingly, the trial court erred in its failure to suppress the illegally obtained evidence.

Appellant's petition for a hearing by the Supreme Court was denied September 7, 1978. Bird, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.