Raul GONZALES, et al.,
Plaintiffs-Appellants,

v.

The CITY OF PEORIA, et al.,
Defendants-Appellees.

No. 82–5432.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 17, 1983.

Decided Dec. 16, 1983.

---

3. The *Campbell* opinion had not been decided     at the time of her ruling.

Kenneth L. Schorr, Phoenix, Ariz., for plaintiffs-appellants.

Thomas N. Crowe, Hiner & Crowe, Phoenix, Ariz., for defendants-appellees.

Before HUG and FARRIS, Circuit Judges, and IRVING,* District Judge.

HUG, Circuit Judge:

This case concerns the authority of state and local police officers to arrest persons for violations of federal immigration laws. Eleven persons of Mexican descent brought this action against the City of Peoria, Arizona, and certain of its police officers and public officials. They claimed the city police, acting under policies adopted by the City, engaged in the practice of stopping and arresting persons of Mexican descent without reasonable suspicion or probable cause and based only on their race and appearance. It was alleged that persons stopped under this policy were required to provide identification or documentation of legal presence in the United States, and that persons not carrying identification or documentation were detained at the city jail for release to immigration authorities. Each of the plaintiffs claimed he had been unlawfully stopped, questioned and detained by the defendants in violation of the fourth and fourteenth amendments to the United States Constitution and the Civil Rights Act of 1871. These claims were not asserted as a class action, but as claims of individual plaintiffs against specific defendants.

After a bench trial, the district court, 537 F.Supp. 793, granted judgment to the defendants. The court found it was not the adopted pattern and practice of the Peoria Police Department to stop and detain persons of Mexican descent for the purpose of enforcing federal immigration laws. It also found that individual defendants had acted in good faith and had not been motivated by racial animus. The court concluded that no defendant had acted in violation of the fourth amendment and that the plaintiffs had failed to prove they were denied any rights secured by the Constitution or any federal law.

To resolve the appellants' claims, we must consider the following issues: (1) Do the Peoria City Police have authority under state and federal statutes to arrest for violations of immigration law? (2) Are the City and the individual defendants liable to the appellants for damages for alleged deprivation of their constitutional rights? (3) Are the appellants entitled to equitable relief to prevent future constitutional violations?

I

FACTS

At trial, appellants contended there had been numerous incidents in which persons of Mexican descent were unlawfully stopped, questioned, and detained. These incidents are described in detail in Section III of this opinion. Appellants claimed each incident resulted from implementation of official city policy. They produced evidence of written policies that were varied and, in some respects, inconsistent. The department's policy regarding arrests for immigration law violations was first enunciated in a memorandum dated January 9, 1978. That document provided that "state law enforcement officers have the authority to make arrests for federal violations. *United States v. DiRe,* 332 U.S. 581 [68 S.Ct. 222, 92 L.Ed. 210 (1947)] .... [O]fficers have the authority to take illegal aliens into custody." The department implemented this policy statement in its Operations Order No. B–4, which stated that "only I.N.S. agents can take suspected aliens into custody" but "[v]iolators of Federal Immigration Laws will be arrested and booked" and held for pick up by the Border Patrol.

---

* The Honorable J. Lawrence Irving, United States District Judge for the Southern District of California, sitting by designation.

Appellants introduced into evidence a series of letters discussing this policy. The first, sent to the chief of police by the city attorney on May 10, 1978, stated that Arizona law authorized arrest for misdemeanors only if they were committed in the officer's presence. It characterized a misdemeanor violation of 8 U.S.C. § 1325 [1] as a continuing violation, so that a present effort to avoid apprehension would constitute a misdemeanor committed in the arresting officer's presence. Based on this analysis, the letter authorized arrest of a suspect who is "charged with an independent offense" or who "[a]dmits he is an illegal alien."

Following the filing of this action, on August 10, 1978, the chief of police wrote to the city attorney. He stated the opinion that "we are bound by the Federal laws of the United States to detain and hold illegal aliens for the United States Border Patrol." The letter implicitly defined "illegal alien" as a person who had illegally *entered* the country in violation of 8 U.S.C. § 1325. A second letter from the chief of police, dated September 7, 1978, advised the mayor of Peoria that officers made no special effort to arrest illegal aliens, but only made arrests on that basis where there was independent cause to interrogate the individual and where immigration status was revealed during questioning. The letter relied upon a news release issued by then-Attorney General Bell on June 23, 1978, which urged state and local police not to stop, question, detain, arrest, or place an "immigration hold" on persons solely on the ground that they might be deportable aliens. The news release asked that the Immigration and Naturalization Service be notified if persons arrested for independent criminal violations were suspected of being undocumented aliens. The chief of police viewed that request as authorizing then-current department policy.

On October 1, 1978, Operations Order No. B–4 was revised to instruct officers that persons arrested for violations of federal immigration law were not to be booked for illegal entry in violation of 8 U.S.C. § 1325 "unless a specific criminal or traffic offense has been charged against the subject." The revised order also directed arresting officers to advise the Border Patrol of the arrest, since "only I.N.S. agents can take suspect aliens into custody."

The next policy evidence chronologically was a memorandum sent to all officers by the department's commander of field operations. It appeared to represent a clear change in policy, directing that · "[a]t no time will any Illegal Alien be arrested just because he is an Illegal Alien ... or because he was with a subject who was the principal of a traffic stop or field interview." This policy statement was dated January 1, 1979.

The final step in the policy's evolution was issued January 1, 1982, as Operations Order D–9. That order stated that although neither the Constitution nor federal law prohibited local enforcement of immigration law, no state law authorized such enforcement. Officers were therefore instructed to refrain from stopping, questioning, arresting, or placing an immigration hold on suspects "solely on the grounds that they may be deportable aliens." However, the policy did authorize officers to detain temporarily persons suspected of illegal entry for a period "not [to] exceed twenty-four (24) hours, with the exception of weekends." This final policy element was drawn from a letter from the United States Attorney for the District of Arizona, dated August 20, 1979, that advised appellees' attor-

---

1. 8 U.S.C. § 1325 provides:

Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than two years, or by a fine of not more than $1,000, or both.

## 474

ney that officers who, in the course of their normal duties, encountered undocumented aliens suspected of illegal entry, could temporarily detain them while contacting the Border Patrol.

The plaintiffs elicited testimony from several officers and the former and present chiefs of police regarding their understanding and implementation of these policies. Not surprisingly, the testimony revealed substantial confusion as to what the policies permitted and what state and federal law required. The officers also testified they were given no training in federal immigration law and no explanation of the department's written policies.

## II

## AUTHORITY TO ARREST

Appellants contend that enforcement of the immigration laws is a matter of exclusive federal concern, and that the doctrine of preemption therefore precludes any state or local enforcement. They view the Immigration and Naturalization Act as a comprehensive regulatory scheme that delegates enforcement duties to the Immigration and Naturalization Service, through the Attorney General, but makes no concurrent delegation authorizing the states to prevent illegal entry into the United States.

■ The general rule is that local police are not precluded from enforcing federal statutes. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. DiRe,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Where state enforcement activities do not impair federal regulatory interests concurrent enforcement activity is authorized. *Florida Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Therefore, federal regulation of a particular field should not be presumed to preempt state enforcement activity "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *De Canas v. Bica,* 424 U.S. 351, 356, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1976) (quoting *Florida Avocado Growers,* 373 U.S. at 142, 83 S.Ct. at 1217).

■ Although the regulation of immigration is unquestionably an exclusive federal power, it is clear that this power does not preempt every state activity affecting aliens. *De Canas,* 424 U.S. at 354–55, 96 S.Ct. at 935–36. The plaintiffs' reference to exclusive federal authority over immigration matters thus does not resolve this question. Instead, we must define precisely the challenged state enforcement activity to determine if "the nature of the regulated subject matter permits no other conclusion."

The City's claim of authority is limited. It asserts only the power to enforce the criminal provisions of the federal immigration laws. There is nothing inherent in that specific enforcement activity that conflicts with federal regulatory interests. Federal and local enforcement have identical purposes—the prevention of the misdemeanor or felony of illegal entry. The subject matter of the regulation thus does not require us to find that state enforcement is preempted.

The plaintiffs contend the structure of the Immigration and Naturalization Act evidences an intent to preclude local enforcement of the Act's criminal provisions. To conclude preclusion was the legislative intent, we would have to find that "complete ouster of state power … was 'the clear and manifest purpose of Congress.'" *De Canas,* 424 U.S. at 357, 96 S.Ct. at 937 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). No such intent is manifested in the Act.

■ Plaintiffs correctly assert that an intent to preclude local enforcement may be inferred where the system of federal regulation is so pervasive that no opportunity for state activity remains. *Id.* We assume that the civil provisions of the Act regulat-

ing authorized entry, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration. However, this case does not concern that broad scheme, but only a narrow and distinct element of it—the regulation of criminal immigration activity by aliens. The statutes relating to that element are few in number and relatively simple in their terms. They are not, and could not be, supported by a complex administrative structure. It therefore cannot be inferred that the federal government has occupied the field of criminal immigration enforcement.

Plaintiffs also perceive an implication of preclusion in the specific statutes regulating criminal immigration activities, 8 U.S.C. §§ 1324, 1325, and 1326. Their argument is based on section 1324(c), which expressly authorizes local police to enforce the prohibitions against transporting and harboring certain aliens:

> No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, and *all other officers* whose duty it is to enforce criminal laws.

(Emphasis added.) Neither section 1325, which prohibits unauthorized entry, nor section 1326, which prohibits reentry by a previously deported alien, contains an express authorization of local enforcement. Plaintiffs therefore infer that Congress intended to withhold enforcement authority as to sections 1325 and 1326.

This inference is defeated by the legislative history of the Act. That history was carefully reviewed by the California Court of Appeal in *People v. Barajas,* 81 Cal. App.3d 999, 1004–07, 147 Cal.Rptr. 195, 198–99 (1978), and we agree with its conclusions.

The Immigration and Naturalization Act was considered by the second session of the 82nd Congress. The version of section 1324 passed by the House made no reference to arrest authority. *Id.,* 81 Cal.App.3d at

1006, 147 Cal.Rptr. at 198. The version of section 1324 passed by the Senate authorized enforcement by "all other officers of the United States whose duty it is to enforce criminal laws." Conf.Rep. No. 1505, 82nd Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1358, 1360, 1361. As the *Barajas* court concluded, the clear implication of that version of the statute was that the enforcement of section 1324 was limited, but that of sections 1325 and 1326 was not. As a compromise, however, the conferees agreed to adopt an amendment to section 1324(c) proposed by the House. According to the Conference Report, the amendment "struck out the words 'of the United States,' so that other officers whose duty it is to enforce criminal laws would have authority to make an arrest for a violation of a provision of the act." *Id.* The amendment thus removed the limitations on enforcement authority in section 1324(c). This expansion of authority cannot be read as an implied limitation of sections 1325 and 1326. Instead, it implicitly made the enforcement authority as to all three statutes identical.

■ We therefore hold that federal law does not preclude local enforcement of the criminal provisions of the Act. We must now consider whether state law grants Peoria police the affirmative authority to make arrests under those statutes. *See Ker v. California,* 374 U.S. at 37, 83 S.Ct. at 1631.

■ Where there is no evidence of prior illegal entry, a violation of section 1325 is a misdemeanor. Under the common law rule, an officer could execute a warrantless arrest for a misdemeanor only when it was committed in the officer's presence. Former Arizona statutes were consistent with the common law rule. *See State v. Nixon,* 102 Ariz. 20, 423 P.2d 718, 720 (1967). In early drafts of its policy, based on legal advice, the City took the position that illegal entry was a continuing offense. The misdemeanor would thus occur in the presence of any arresting officer and could give rise to a warrantless arrest. This analysis did not remain viable after our decision in *United States v. Rincon-Jiminez,* 595 F.2d

1192, 1194 (9th Cir.1979), in which we held the violation of section 1325 was completed at the time of entry. Plaintiffs suggest this interpretation left the City without authorization to make warrantless misdemeanor arrests.

The Arizona statutes in effect at the time the incidents involved in this case occurred did not duplicate the common law rule. Ariz.Rev.Stat.Ann. § 13–3883 (1978) authorized two types of misdemeanor arrests:

A peace officer may, without a warrant, arrest a person:

. . . .

2. When he has probable cause to believe a misdemeanor has been committed in his presence and probable cause to believe the person to be arrested has committed the offense.

. . . .

4. When he has probable cause to believe a misdemeanor has been committed and probable cause to believe the person to be arrested has committed the offense. The person so arrested shall be released in conformity with the provisions of § 13–3903.

Plaintiffs contend subsection 4 has no application to this case, emphasizing its reference to Ariz.Rev.Stat.Ann. § 13–3903 (1978). That statute permits the arresting officer to release a misdemeanor arrestee from custody "in lieu of taking such person to the police station" after issuing a written notice and complaint. Although section 13–3903 states "the arresting officer *may* release the arrested person," section 13–3883(4) specifies that the arrestee "shall be released." Plaintiffs rely on this ambiguity to argue that release is mandatory whenever the offense occurs outside the officer's presence. Under this analysis, the custodial arrests involved here would violate the state statute.

■ Arizona courts have made clear that where the offense occurs in the officer's presence, release under section 13–3903 is not mandatory, but is discretionary with the arresting officer. *State v. Pickett,* 126 Ariz. 173, 613 P.2d 837, 838 (Ariz.App.1980); *State v. Lynch,* 120 Ariz. 584, 587 P.2d 770,

773 (Ariz.App.1978). There is no suggestion in the statutory language that the officer is divested of that discretion if the offense occurs outside his presence. This discretion is apparent in the 1982 amendment to section 13–3883(4). The final sentence of the subsection now reads: "A person arrested under this paragraph *is eligible* for release under § 13–3903." This amendment confirms our conclusion that section 13–3883(4) authorizes a custodial arrest.

■ We also note that "release" under section 13–3903 does not preclude short-term custody. Subsection B authorizes the arresting officer to take the arrestee to the police station, issue written notice and a complaint, and then release the arrestee. That provision is also discretionary.

■ We therefore conclude that state law authorizes Peoria police to enforce the criminal provisions of the Immigration and Naturalization Act. We firmly emphasize, however, that this authorization is limited to criminal violations. Many of the problems arising from implementation of the City's written policies have derived from a failure to distinguish between civil and criminal violations of the Act. Several of the policy statements use the term "illegal alien," which obscures the distinction between the civil and the criminal violations. In some instances, that term has been used by the City to mean an alien who has illegally entered the country, which is a criminal violation under section 1325. In others, it has meant an alien who is illegally present in the United States, which is only a civil violation. There are numerous reasons why a person could be illegally present in the United States without having entered in violation of section 1325. Examples include expiration of a visitor's visa, change of student status, or acquisition of prohibited employment. Arrest of a person for illegal presence would exceed the authority granted Peoria police by state law.

■ Furthermore, an arresting officer cannot assume that an alien who admits he lacks proper documentation has violated section 1325. Although the lack of docu-

mentation or other admission of illegal presence may be some indication of illegal entry, it does not, without more, provide probable cause of the criminal violation of illegal entry. The arrest must therefore be supported by additional evidence that the arrestee entered without inspection. In implementing the arrest authority granted by state law, local police must be able to distinguish between criminal and civil violations and the evidence pertinent to each. In the future, this may require refinements of both the written policies and officer training programs.

We further emphasize that arrests for federal offenses can be justified by state law authorization only if the arrest procedures do not violate the federal Constitution. *Ker,* 374 U.S. at 37, 83 S.Ct. at 1631. The evidence indicates that the City's most recent written policy is based on a misconception of constitutional requirements. The chief of police expressed the conviction that "detaining" persons in custody for suspected violations of the Act is different from arresting them. There is no constitutional distinction between these procedures. "Detention" defines a special category of fourth amendment seizures that are substantially less intrusive than arrests. *Dunaway v. New York,* 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). Because detention represents only a limited intrusion, it can be justified by a reasonable suspicion of criminal activity. *Id.* at 211–12, 99 S.Ct. at 2255–56. However, that suspicion justifies only a brief stop and interrogation and, under proper circumstances, a brief check for weapons. *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). If the seizure involves anything more than the brief and narrowly-defined intrusion authorized by *Terry,* it must be justified by probable cause. *Dunaway,* 442 U.S. at 212, 99 S.Ct. at 2256; *Brignoni-Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580. *Dunaway* makes absolutely clear that where the defendant is transported to the police station and placed in a cell or interrogation room he has been arrested, even if the purpose of the seizure

is investigatory rather than accusatory. 442 U.S. at 212–13, 99 S.Ct. at 2256–57; *see also Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). Because such a seizure constitutes an arrest, it must be supported by probable cause. *Dunaway,* 442 U.S. at 214, 99 S.Ct. at 2257; *United States v. Chamberlin,* 644 F.2d 1262, 1266 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

In seizing persons suspected of violations of 8 U.S.C. § 1325, Peoria police have adopted a procedure identical to that described in *Dunaway.* Defendants are walked or driven to the police station and held pending interrogation by the Border Patrol. This seizure constitutes an arrest, and the constitutional standards cannot be avoided by labeling it a mere detention. Prior to invoking this procedure, the police must therefore have probable cause to believe either that illegal entry has occurred or that another offense has been committed. As we have indicated, inability to produce documentation does not in itself provide probable cause. For example, if a passenger in a vehicle stopped by the police cannot, or does not, provide identification, his failure to do so does not justify transporting him to the station and holding him for the Border Patrol. *See Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983) (plurality opinion); *Brown v. Texas,* 443 U.S. 47, 53, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979).

To summarize, nothing in federal law precluded Peoria police from enforcing the criminal provisions of the Immigration and Naturalization Act. Arizona law authorizes local officers to arrest for violations of 8 U.S.C. § 1325 where there is probable cause to believe the arrestee has illegally entered the United States. However, enforcement procedures must distinguish illegal entry from illegal presence and must comply with all arrest requirements imposed by the federal Constitution.

## III

### CLAIMS FOR DAMAGES

We now review the specific violations alleged by the plaintiffs under the stan-

dards we set out above. We begin by summarizing the six incidents on which the plaintiffs base their claims.

The first incident occurred on September 13, 1977, at Saliba's Market. It involved defendants Watters and Cuker, but none of the named plaintiffs. Watters, Cuker, and several other officers were dispatched to the market at the request of the Border Patrol, which asked the officers to arrest persons arriving in a blue pickup truck. The request did not reveal what information the Border Patrol had that the suspects had illegally entered the country. Four persons were arrested in the market. They were not charged with any state or local criminal offense, but were held for release to the Border Patrol.

Saliba's Market was also the scene of an incident on February 18, 1978. It involved plaintiffs Arbiso and Ramirez, but none of the named defendants. The arresting officer testified that he observed six men loading groceries into the back of a pickup truck. The groceries were stacked around the truck, impairing the traffic flow on the two-lane street in front of the store. The officer stopped to investigate primarily because of the interference with the traffic flow, but also because the men grouped around the truck "fit the profile of an illegal alien." He questioned the men in English and asked them for immigration papers. The evidence does not reveal what answers Arbiso and Ramirez gave to these questions or whether the responses provided probable cause to arrest them. Both men were taken to the station and held for the Border Patrol.

The next incident occurred on February 21, 1978, at Bodine's Market. Although several of the defendants were involved, none of the plaintiffs was present. The police responded to a complaint that about 25 persons were milling around behind the market. A special riot squad, including four or five police cars, was dispatched. As the cars approached with lights and sirens on, the crowd fled into nearby citrus groves. The officers made some attempt to apprehend the fleeing suspects, but no one was taken into custody.

A second incident at Bodine's Market occurred on April 15, 1978. Officers responded to a call describing a fight. They observed two men scuffling and a crowd of others looking on. They proceeded to question on-lookers as to their identities and immigration status. Plaintiffs Trejo and Guerra were taken into custody. The record does not indicate which officers arrested them or whether the interrogation provided probable cause for the arrests. Plaintiff Sanchez was detained at the scene for five to ten minutes. An unidentified officer held him by the neck, injuring him, and questioned him. Sanchez had not participated in the fight, and he was questioned only as to his immigration status. When he persuaded the officer he was a United States citizen, he was released.

The next incident occurred June 26, 1978, at the United States Post Office. It involved plaintiffs Quintanilla, Aurelio Gonzales, and Gustavo Gonzales. No named defendants were present. The arresting officer observed four men leave the post office and enter Quintanilla's car. Because their behavior seemed suspicious, the officer stopped the car and requested identification of each of its occupants. Quintanilla, who produced a "green card" but no driver's license, was cited for a traffic violation and released. Aurelio and Gustavo Gonzales admitted, through Quintanilla, that they were in the country illegally. They were taken into custody and held for the Border Patrol.

The final incident occurred on October 2, 1981, at the Pueblo Plaza Shopping Center. It involved plaintiff Chavez-Diosdado; no named defendants were present. The arresting officer observed a car parked behind one of the stores in an alley that was not a usual entrance for shoppers and had been an area for criminal activity. The officer approached the car and, noting further suspicious behavior, asked the three occupants to get out and identify themselves. The two passengers produced no identification but indicated Chavez-Diosdado was an illegal alien. All three were placed in a police

car, where Chavez-Diosdado produced a green card. He was released and his passengers were taken to the station and held for the Border Patrol.

The plaintiffs also offered in evidence many police reports. No plaintiffs were involved in the incidents described in these reports. They were offered as evidence of a pattern of police conduct. Generally, the reports were based on traffic violations and described incidents in which the driver or passenger was unable to provide identification or immigration documentation and was therefore taken into custody.

■ The plaintiffs have asserted damage claims against five individual officers. However, as our summary of the incidents indicates, no liability has been established by any plaintiff against any of the individual officers. In each of the specific incidents involved, either no plaintiff was involved or it was not established that any officer had committed any of the acts of which the plaintiffs complained. The damage claims against officers Branham, Foltz, Gragg, Luttrell, and Watters were thus properly denied.

The plaintiffs also asserted claims against former Chief of Police Happersett and the present chief, Cuker. The district judge denied the claims against these officers on the basis that they had acted in good faith in exercising their supervisory duties. *See Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Harris v. City of Roseburg,* 664 F.2d 1121, 1127 (9th Cir.1981). The good faith standard required these defendants to establish both that they subjectively believed their acts did not violate the plaintiffs' rights and that their belief was reasonable. *Id.* at 1128. The standard was satisfied.

■ The evidence indicated that these officers acted in both subjective and objective good faith in attempting to implement the department's policies and to perform their duties under the law as they understood them. They consulted with the Border Patrol and the city attorney and attempted to incorporate what they understood to be the advice of the Attorney General of the United States and the United States Attorney. These efforts to clarify the legal basis for their procedure establish the supervising officers' objective good faith. They were not required to predict how this court would resolve the difficult legal issues raised in this case. *See Pierson,* 386 U.S. at 557, 87 S.Ct. at 1219. The district court's finding that these officers acted in good faith is not clearly erroneous.

■ The district court also found that the mayor, the city manager, and the members of the city council had acted in good faith. The evidence indicated there was no participation by these individuals in the development of the department's policies. They delegated this law enforcement duty to the police and the city attorney, who were attempting to coordinate their efforts with federal agencies. They neither acted with malicious intent nor disregarded the arrestees' "clearly established constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The finding that they acted in good faith thus was not clearly erroneous.

■ We also agree that the City's liability for damages was not established, even though the good faith of the individual defendants does not shelter the City. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). The City's liability for damages could not be based solely on the fact that it employed the individual defendants. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *White v. Washington Public Power Supply System,* 692 F.2d 1286, 1290 (9th Cir.1982). The basis for liability was clearly stated in *Monell:*

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

the injury [for which] the government as an entity is responsible under § 1983. 436 U.S. at 694, 98 S.Ct. at 2037. The policy may be express or may be manifested by tacit approval or encouragement of employee actions. *White,* 692 F.2d at 1290; *Harris,* 664 F.2d at 1130.

■ The department's written policies do not provide a basis on which the City can be held liable. The present and former policies are imprecise, especially in their use of the term "illegal aliens." They indicate substantial confusion as to the department's authority to make arrests under 8 U.S.C. § 1325, but err by understating that authority, rather than overstating it. These policies do not authorize violations of constitutional rights.

We have reviewed closely the present policy, Operations Order D–9. Paragraph 1 of the Order states that there is nothing in the Constitution or federal law that prohibits local enforcement of federal immigration law. Read in context, this statement appears to refer to the criminal provisions of the Immigration and Naturalization Act; it is thus correct. The paragraph goes on to conclude that state law does not authorize local enforcement. As we have explained, this is incorrect because Ariz.Rev.Stat.Ann. § 13–3883 authorizes arrests for violations of 8 U.S.C. § 1325.

Paragraph 2 of the policy is a correct statement of the law. It directs the police not to stop and question, arrest, or place an "immigration hold" on persons "not suspected of crimes or traffic violations, *solely on the grounds that they may be deportable aliens.*" (Emphasis in original.)

The third paragraph attempts to follow the advice given the City by the United States Attorney. It provides that if officers, in the course of their normal duties, encounter persons who they suspect illegally entered the United States, and if probable cause supports that suspicion, the suspects may be "detained" for a brief period not to exceed twenty-four hours. Of course, such a seizure would be an arrest, not a detention. The probable cause requirement renders this provision an accurate statement of state and federal law. This order does not change previous department policy, but merely attempts to clarify and refine it. It illustrates that the City's express policy in effect at the time of the incidents did not authorize violation of the plaintiffs' fourth amendment rights and thus could not result in liability to them.

As an alternate ground for their damage claims, the plaintiffs alleged violation of their rights to equal protection. They claimed Peoria police applied discriminatory policies to Spanish-speaking persons and those who appeared to be of Mexican descent. The alleged policies included unfounded stops, interrogations, and demands for identification.

■ Even if it were shown that Peoria police directed an unusual proportion of their law enforcement activities toward persons of Mexican descent, proof of the policies' disproportionate impact would not establish a violation of the equal protection clause. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The plaintiffs were required to prove an intent to discriminate, explicit or implicit, to establish the claimed constitutional violation. *Id.* The district court determined that "[p]laintiffs have made no legal or factual showing sufficient to establish the existence of racial animus or other improper motives of defendants." We review the district court's findings as to the defendants' intent for clear error. *Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66, 79 (1982). After carefully reviewing all of the testimony in this case, we conclude that this finding was not clearly erroneous.

IV

CLAIMS FOR EQUITABLE AND DECLARATORY RELIEF

We must first consider whether the plaintiffs have standing to demand equitable and declaratory relief. In *City of Los Angeles v. Lyons,* —— U.S. ——, ——, 103 S.Ct. 1660, 1668, 75 L.Ed.2d 675, 688 (1983), the Supreme Court held that a section 1983

plaintiff had standing to seek the enjoining of a police practice or policy only if he could show he was "realistically threatened by a repetition" of the violation of his constitutional rights. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse affects." *Id.* at ——, 103 S.Ct. at 1665, 75 L.Ed.2d at 684 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974)). In *Lyons,* the plaintiff's damage claim had been severed and was not before the Court. —— U.S. at —— n. 6, 103 S.Ct. at 1667 n. 6, 75 L.Ed.2d at 686 n. 6. His claim for injunctive relief, standing alone, did not present a case or controversy because he had not alleged a real and immediate threat from future application of the city's policy. *Id.* at —— & n. 7, 103 S.Ct. at 1667 & n. 7, 75 L.Ed.2d at 687 & n. 7.

■ The instant case is not a class action brought on behalf of any particular segment of the Peoria community. The plaintiffs therefore must demonstrate individually a real threat of future violations of their constitutional rights. Eight of the plaintiffs are Mexican nationals who were illegally present in this country at the time of the incidents and who now reside in Mexico. It is most doubtful those plaintiffs could demonstrate a real likelihood of future violations. They therefore lack standing to demand equitable relief.

■ Of the three remaining plaintiffs, Raul Gonzales and Jose Quintanilla are resident aliens and Guadalupe Sanchez is a United States citizen. Each was involved in one of the six incidents on which the plaintiffs rely, and Quintanilla testified he had been involved in two other such incidents. By alleging that all Peoria officers make a practice, based on city policy, of violating the constitutional rights of Peoria residents of Mexican descent, and that this policy is consistently applied to drivers and passengers of vehicles stopped for traffic violations, these three plaintiffs have demonstrated a sufficient future threat of constitutional violations. Moreover, unlike the

situation in *Lyons,* there is no indication here that the plaintiffs' damage claims are severable from their demands for equitable relief. We therefore conclude their allegations present a case in controversy as to injunctive relief, and we consider the merits of that claim.

■ The Supreme Court has mandated that federal courts exercise restraint in issuing injunctions against state officers engaged in criminal law enforcement. *O'Shea,* 414 U.S. at 499, 94 S.Ct. at 677. This restraint is based on principles of equity, comity, and federalism that "should inform the judgment of federal courts when asked to oversee state law enforcement authorities." *Lyons,* —— U.S. at ——, 103 S.Ct. at 1670, 75 L.Ed.2d at 691. Consistent with these principles, federal courts may not intervene in state enforcement activities absent extraordinary circumstances that threaten immediate and irreparable injury. *Id.; Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).

■ Our intervention into the enforcement activities of the Peoria Police Department could not be justified as necessary to prevent the violation of constitutional rights. Our review of the record convinces us that the Peoria police are perfectly willing to comply with federal law, once it is made clear to them what their responsibilities are. There is no indication that the police intended to use the law as a pretext to harass persons of Mexican descent. The evidence indicates that the department is not anxious to enter actively into the enforcement of the immigration laws, other than to cooperate with the Border Patrol. Active pursuit of such enforcement would place a strain on jail facilities and on personnel availability. For that reason, no incentives are provided officers for arresting persons for violations of 8 U.S.C. § 1325. Enforcement of that statute is not reflected on an officer's record as an "arrest" for which credit on performance evaluations is received.

We do not rule out the possibility that individual officers in the past have abused

482

their authority or that such abuse may occur in the future. However, there is no indication that the wrongful conduct of individual officers is encouraged or ratified by any city or police policy. In view of the principle, reaffirmed in *Lyons,* that we must avoid interference with state and local law enforcement unless it is necessary to prevent policies that violate constitutional rights, we affirm the district court's denial of injunctive relief.

The judgment is AFFIRMED.