**MOUNTAIN HIGH KNITTING, INC.; Mountain High Hosiery, Ltd.; Maria Palos, et al., Plaintiffs–Appellants,**

v.

**Janet RENO,\* Attorney General of the United States; Gene McNary, Commissioner, Immigration & Naturalization Service; Immigration and Naturalization Service, Defendants–Appellees.**

No. 92–56555.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 1994.

Decided March 30, 1995.

* Janet Reno is substituted for her predecessor William P. Barr, Attorney General of the United States, pursuant to Fed.R.App.P. 43(c)(1).

Samuel A. Bettwy, Special Asst. U.S. Atty., San Diego, CA, for defendants-appellees.

Before: BROWNING, PREGERSON, and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

Mountain High Knitting, Inc. and several of its employees (collectively, "Mountain High") sued the Attorney General, the Commissioner of the Immigration and Naturalization Service, and the Service itself (collectively, "the INS") on claims arising out of an INS investigation and raid of Mountain High Knitting, Inc.'s factory in San Diego. Mountain High also challenged several practices typical to such an employer sanctions investigation on behalf of a proposed class and sought declaratory and injunctive relief.[1]

The INS responded with a motion to dismiss or, in the alternative, for summary judgment. Mountain High amended its complaint and the court ruled on the government's motion on the basis of the amended complaint. Of the six causes of action in the complaint, the court initially dismissed three and granted summary judgment as to two. It ordered a hearing on the remaining claim, and after that hearing the district court dismissed the final claim as well. Mountain High timely appeals.

We have jurisdiction pursuant to 28 U.S.C. § 1291. In a separately-filed memorandum disposition, we affirm the district court as to four of Mountain High's claims. The two remaining items in the complaint allege excessive detention of suspected undocumented employees and interference without due process of law with the employees' right to work. In this opinion, we reverse and remand the district court's dismissal of the claim regarding arrest practices, but affirm the district court's grant of summary judgment for the INS on the due process claim.

Carlos Holguin, Center for Human Rights and Constitutional Law, Los Angeles, CA, for plaintiffs-appellants.

---

1. The district court did not certify the class, and its rulings addressed only the named plaintiffs. Appellants do not challenge this approach with respect to the claims we address in this opinion.

*Standards of Review*

■ This court reviews *de novo* the district court's dismissal of causes of action for failure to state a claim. *Buckey v. County of Los Angeles,* 968 F.2d 791, 793–94 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992). Review of such dismissals is based on the contents of the complaint, and it must appear beyond doubt that the plaintiffs could prove no set of facts which would entitle them to relief on their claims. *Id.* at 794.

■ We also review *de novo* the district court's grant of summary judgment. *Jones v. Union Pacific R.R.,* 968 F.2d 937, 940 (9th Cir.1992). We must construe the evidence in the light most favorable to Mountain High and determine whether Mountain High has raised genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Tzung v. State Farm Fire & Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

*Discussion*

*A. INS Arrest Practices.*

The individual appellants were among those arrested during the January 1991 INS raid on Mountain High's factory. When questioned by INS agents at the factory, they claimed lawful immigration status but stated that they were not then in possession of their green cards. All were taken to an INS detention center while their status was checked. Those who were found to be legally present in the United States were released after some hours, but the INS apparently provided them no transport back from the detention center located some 15 miles from the plant. The government does not contest appellants' assertion that the INS had arrested them.[2]

■ Appellants claim that this handling constituted excessive detention in violation of their Fourth Amendment rights. The officers undoubtedly had probable cause to arrest them for violation of 8 U.S.C. § 1304(e) (1988), which makes failure to carry alien

registration documentation an independent federal misdemeanor. *See Martinez v. Nygaard,* 831 F.2d 822, 828 (9th Cir.1987) ("An individual's admission that she is an alien, coupled with her failure to produce her green card, provides probable cause for an arrest."). However, appellants argue that the INS did *not* arrest them for violating § 1304(e), but rather effected civil deportation arrests on suspicion of illegal entry. They point to the subsequent release of all arrestees who were found to have entered legally, suggesting that the INS would never have arrested them simply for the green-card offense. According to appellants, then, the purported § 1304(e) arrests were *only* a pretext for actual civil arrests on suspicion of illegal entry.

This allegation acquires significance because we have held that "[a]lthough the lack of documentation or other admission of illegal presence may be some indication of illegal entry, it does not, without more, provide probable cause of the criminal violation of illegal entry." *Gonzales v. City of Peoria,* 722 F.2d 468, 476–77 (9th Cir.1983). The INS did not allege nor do appellants concede the existence of the additional particularized evidence required for such probable cause. *Gonzales* thus forecloses the possibility that the INS could have arrested appellants for a violation of 8 U.S.C. § 1325(a), which criminalizes illegal entry.

Meanwhile, the plain language of 8 U.S.C. § 1357(a)(2), which grants INS officers the power to make warrantless civil deportation arrests, forecloses the possibility of a permissible civil arrest under these circumstances. Section 1357(a)(2) requires that the arresting officer reasonably believe that the alien is in the country illegally *and* that she "is likely to escape before a warrant can be obtained for [her] arrest." Again, the INS did not allege nor do appellants concede the existence of grounds for a reasonable belief that they were particularly likely to escape. Thus, on the basis of the pleadings we find that the only legitimate basis for arresting appellants was § 1304(e).

**2.** This position obviates the need for us to address the issue of what might have constituted reasonable investigatory detention once INS agents had generated reasonable articulable suspicion of illegal entry. *See Benitez–Mendez v. INS,* 760 F.2d 907, 909 (9th Cir.1983).

█ The district court dismissed the individual appellants' excessive detention claim on the basis of *Martinez's* holding regarding § 1304(e) probable cause. However, while the district court's ruling finds general support in the Supreme Court's repeated declarations that standards of objective reasonableness must govern evaluation of Fourth Amendment claims, *see, e.g., Scott v. United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), this circuit continues to recognize the possibility of impermissibly pretextual Fourth Amendment seizures. *See United States v. Cannon,* 29 F.3d 472, 474–75 (9th Cir.1994). In *Cannon,* we held that the test for legality of an allegedly pretextual Fourth Amendment seizure is whether a *reasonable* officer *would have* seized the defendant under the given circumstances. *Id.* at 475. The need to apply the *Cannon* test to the arrests here means that there *is* a set of facts under which appellants could prove their excessive detention claim, and we must therefore hold that the district court erred in dismissing it. On remand, the district court will presumably assess whether reasonable INS officers would have arrested appellants solely for violating § 1304(e), absent suspicion of illegal entry. The § 1304(e) arrest power does not permit "rounding up the suspects" *simply* in order to investigate aliens' immigration status.[3]

### B. Interference with the Right to Work.

Days after the factory raid, the INS commenced what it calls the "inspection stage of the employer sanctions investigation." It served Mountain High with an inspection notice and a subpoena. After this inspection of Mountain High's records, the INS checked the information obtained from Mountain High's employment eligibility verification forms ("I–9s") against the agency's own records for 103 of Mountain High's remaining employees.

In conformity with INS practice, the I–9s that failed to correspond to authorizations in INS records—covering 15 employees in all— became the subject of a "no-match" letter to Mountain High on February 11, 1991. That document stated in relevant part:

> This letter is to inform you that, according to [INS] records, the alien registration cards presented to you and the alien numbers recorded on the Form I–9 does [sic] not relate to the above listed individuals. Unless they present valid identification and employment eligibility documentation acceptable for completing the Form I–9, they are unauthorized to work in the United States.
>
> This is a very serious matter that requires your immediate attention. The law imposes civil penalties ... if you hire an alien knowing that they are not authorized to work in the United States or continue to employ an alien knowing the alien is or has become an alien not authorized to work in the United States. If you or the employee feel this determination is in error and the employee is an authorized worker, please contact ...

At least 12 of the 15 continued to work. While checking their documents, Mountain High placed the employees on paid administrative leave for from several hours to a full shift. The INS ultimately determined that 11 of the 15 were in fact legally present and authorized to work. The initial errors were apparently attributable to both the INS and Mountain High.

Appellants, who were among those listed in the no-match letter actually holding valid

---

**3.** We note that the affected plaintiff in *Martinez* made no claim of pre-textual arrest and that in any event the facts here are meaningfully distinguishable from those of *Martinez.* The arrestee in that case, Carmen Rayo, told raiding INS agents that her papers were at home. They placed her with other detained workers in the plant. After fifteen minutes agents took Rayo to a van bound for a detention center, but after another five minutes they released her when her husband arrived from home with her papers. We held that Rayo had been arrested during this 20–minute period, but that under the circumstances her arrest had been reasonable, and we specifically noted that "[t]he agents held her only until her husband brought her card." 831 F.2d at 828; *see also United States v. Pulido–Baquerizo,* 800 F.2d 899, 901 (9th Cir.1986) ("Under the fourth amendment, only unreasonable searches and seizures are prohibited."). Here, similarly legal resident aliens were hauled down to a detention center for some hours and then turned out on the street far away from their workplace. However, we decline to assess the reasonableness of this detention on the basis of the record at the dismissal stage.

green cards, alleged interference with their right to work without due process of law. The complaint suggested that INS no-match letters coerce employers into suspending or firing employees identified in the letters, and specifically alleged that three appellants (Palos, Rangel, and Dragos) had lost productive work time as a result of the February 11 INS letter's erroneous statements as to their status, while the company had also been deprived of their services during the time it placed them on leave. The district court granted summary judgment on this claim.

█ We hold that the district court did not err in granting the INS's motion for summary judgment. As the INS argues and the district court held, the no-match letter did not direct Mountain High Knitting to do anything except comply with its preexisting affirmative obligations under the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359 (1986) (codified in various sections of Title 8, U.S.C.).[4] *See New El Rey Sausage Co. v. INS,* 925 F.2d 1153, 1158 (9th Cir.1991); *Mester Mfg. Co. v. INS,* 879 F.2d 561, 563 (9th Cir.1989). It simply informed the company of the statutory penalties for *knowingly* employing an alien not authorized to work in the United States and directed it to recheck the documents of listed employees. If the company then placed these workers on leave, it was acting voluntarily and any harm it claims from the loss of their services cannot fairly be traced to the INS letter.[5] *See New El Rey Sausage Co.,* 925 F.2d at 1158 (after receiving a letter with nearly identical language, company had a reasonable length of time to determine whether the employees did

in fact possess valid authorization documents and was not required to suspend or terminate them).

█ The individual appellants thus lack standing to join in this claim. Any purported injury they suffered did not come at the hands of the INS.[6]

**REVERSED AND REMANDED IN PART AND AFFIRMED IN PART.**

---

4. At oral argument, counsel for appellants explicitly stated that appellants do not challenge the constitutionality *per se* of the IRCA compliance scheme. That scheme necessarily requires some expenditure of time and effort on the part of both employers and employees.

5. This court has specifically held that the INS must provide employers with a reasonable period of time for compliance after they become aware that an employee is unauthorized. *Mester Mfg. Co. v. INS,* 879 F.2d 561, 567 (9th Cir.1989). Thus, the INS letter implicitly gave the company reasonable time to recheck the employees' documentation and file new I–9s. The government accurately notes that Mountain High's attorney,

who corresponded actively with the INS both before and after the raid, also represented the appellants in *Mester.*

6. The INS letter suggests that the employer or the employee contact the INS if she feels the INS no-match determination is in error. However, Mountain High's attorney declared that the INS' stated policy is to refuse to discuss status with employees who contact INS directly. This potential due process issue is *not* presented in this appeal, since the complaint does not allege that any of the individual appellants actually attempted to contact the INS directly or take any other actions to rectify the erroneous determinations.